**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
           *Plaintiff-Appellee,*

v.

LORENZO TUCKER,
           *Defendant-Appellant.*

No. 09-10319

D.C. No.
2:08-cr-00025-
KJD-LRL-1

OPINION

Appeal from the United States District Court
for the District of Nevada
Kent J. Dawson, District Judge, Presiding

Argued and Submitted
November 3, 2010—San Francisco, California

Filed April 15, 2011

Before: Ronald M. Gould and Consuelo M. Callahan,
Circuit Judges, and Morrison C. England, Jr.,
District Judge.*

Opinion by Judge Callahan

---

*The Honorable Morrison C. England, Jr., District Judge for the U.S.
District Court for Eastern California, Sacramento, sitting by designation.

5079

**COUNSEL**

Daniel G. Bogden, United States Attorney, Robert L. Ellman, Appellate Chief, Adam M. Flake (argued) and Amber M. Craig, Assistant United States Attorneys, Las Vegas, Nevada, for plaintiff-appellee United States of America.

Mario D. Valencia (argued), Henderson, Nevada, for defendant-appellant Lorenzo Tucker.

**OPINION**

CALLAHAN, Circuit Judge:

Lorenzo Tucker was convicted by a jury in the district court for being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). He was sentenced to 96 months in prison followed by three years of supervised release, and was given a mandatory penalty assessment of $100.00. On appeal, Tucker challenges his conviction and sentence on several grounds. He asserts that (1) there was insufficient evidence to demonstrate that he "possessed" the firearm, (2) the prosecutor committed misconduct during closing arguments, (3) the district court erred by refusing to give his proposed "mere presence" jury instruction, (4) the district court incorrectly calculated the sentencing guidelines, and (5) the sentence he received was substantively unreasonable. We reject all of these arguments and affirm.

**I.**

Tucker was indicted on January 30, 2008, on one count of being a Felon in Possession of a Firearm, in violation of 18 U.S.C. § 922(g)(1) and 924(a)(2). He was tried by a jury in early December of 2008 and was found guilty. On July 28, 2009, the district court sentenced him to 96 months in prison followed by three years of supervised release and a mandatory penalty assessment of $100.00.

**A. Factual Background**

At trial there was evidence presented that on September 2, 2007, Tucker signed a lease to rent an apartment in Las Vegas, Nevada. The lease also listed Dawn Alexander and a child as residents. On September 7, 2007, Alexander called the Nevada Division of Parole and Probation and spoke with Public Safety Officer Gerald Gutierrez. During this conversation, she told Officer Gutierrez that Tucker was her boyfriend

and that they had been living together for "a few days" in the apartment. She said that she had recently broken up with Tucker, was moving out of the apartment, was "en route to" Florida, and was calling because there was a shotgun in a closet in the apartment that belonged to Tucker. Alexander was crying during this phone call, and Officer Gutierrez testified that she seemed "mad," "scared," and "upset." At the time, Tucker was a felon on probation after pleading guilty to "Attempt Child Abuse and Neglect" under Nevada law.

Based on the information that Alexander provided, Officer Gutierrez and three other officers—Hector Aguilar, Darla Vanallen and Ryko Aragaki — drove to the apartment complex and obtained a key to Tucker's apartment. The officers knocked and announced their presence; when there was no response, they entered the apartment and looked around.

The apartment had a hallway in it. On one side of the hallway, there was a small bedroom. The small bedroom appeared to belong to a child and contained children's toys. On the other side of the hallway, there was a master bedroom. There were boxes scattered around, and Officer Guiterrez could not tell "what stuff belonged to [Tucker] and what belonged to someone else."

Officer Aguilar went into the master bedroom and called out "there's a shotgun in the closet." All of the officers then entered the master bedroom, where they found the master closet doors open, revealing a rack with men's clothes, above which was a shelf. A shotgun was on top of that shelf, next to some shoe boxes. The closet contained men's clothing and shoes, and the officers did not see any female belongings in the master bedroom. The officers also found in the bedroom two shotgun shells, two prescription medication bottles bearing Tucker's name, and mail addressed to him.

The officers called the Las Vegas Metropolitan Police Department's firearm unit to handle the shotgun. Officer

Gutierrez checked the gun for ammunition and placed it against the wall in the living room. He was the only one who handled the gun at this time, and he used gloves when doing so.

While the officers were waiting for someone from the Metropolitan firearm unit to arrive, Tucker arrived at the apartment, wearing a cast on one hand. The officers placed him under arrest and read him his Miranda rights; Tucker waived his right to remain silent. He told Officer Gutierrez that he had just moved in to the apartment and was living with a "roommate."

Officer Gutierrez also asked Tucker about the shotgun and Tucker denied that it was his. Officer Gutierrez testified that Tucker seemed to know which shotgun the officer was talking about, even before the gun had been shown to him, and that Tucker "described it as a pop and lock or somethin' like that." According to Officer Gutierrez's trial testimony, Tucker said that:

> [a] couple days prior [he] was—he was hangin' out with some friends. He had seen the shotgun in somebody's trunk. A lot of people were around. And he was handling the gun, the shotgun. And he said—I asked him, you know, Hey, are your fingerprints gonna be on that gun? And he said, Yeah. You know, I was handling the—the shotgun. So my fingerprints, yes, they would be on there.

Tucker could not recall the names of any of the people who were present when he handled the shotgun. Officer Guiterrez testified that Tucker changed his story a "couple times," from the shotgun being in the trunk of one friend's car, to being used by his roommate for protection, to telling the roommate "to get rid of it because he's not supposed to be around guns."

While the officers and Tucker were in the apartment, Las Vegas Metropolitan Police Officer Jessica Flink arrived and

impounded the shotgun and shells. She did not use gloves to handle the shotgun, having been told that it had already been handled by people who were not wearing gloves. She read Tucker his *Miranda* rights. She testified that Tucker told her he lived in the master bedroom and he did not know how the shotgun had gotten in the master closet. Tucker, however, admitted to her that he had seen the shotgun before, and after looking at it again he claimed he had seen it in the back of a friend's car. Officer Flink stated that Tucker said he had handled the shotgun with some friends and had "showed 'em how to use it; put it back in the trunk and that was the last he saw of it." She further stated that Tucker said he did not know the names of the people who were with him, and could not remember what the car looked like.

According to Officer Guiterrez, just as the officers were about to leave the apartment with Tucker, Tucker asked to have some of his pain medication, and said that the medication was next to "his television" in the master bedroom. Officer Vanallen retrieved the medication from the bedroom and gave it to Tucker. Officer Guiterrez said Tucker asked to take the medication with some Gatorade that was in the refrigerator, and the officers gave him some, and then brought him to prison. On the way out, Tucker gave the officers an apartment key and asked them to lock the door.

## B.   Tucker's Federal Criminal Trial

Tucker did not testify at his federal criminal trial. However, the jury heard excerpts from a state court proceeding related to the incident in this case, in which Tucker did testify about his living arrangements and the events of September 7. During the state proceeding, Tucker testified that the shotgun was *not* found in his room, that he did not know the gun was in the large room, and that he lived in the small room and Alexander lived in the large room. He said that Alexander was "mad" at him because he "didn't want to be with her," and that is when she called Officer Guiterrez. On cross-

examination in the state proceeding, Tucker testified that the officers never asked him which room in the apartment was his. He and the prosecutor then had the following exchange:

Q.  Now, why did you have your own personal effects in the master bedroom?

A.  Well, those weren't my effects. She had a boy-friend.

Q.  A boyfriend with the same name as you?

A.  Same name as me?

Q.  Well, you heard the testimony—

A.  I don't know what his name is.

Tucker said that his prescription pills were in the master bed-room, where Alexander lived, and that she was a registered nurse. He said he did not have any clothes in the master bed-room, and had never been inside the master closet. He also said that he did not think he had any paperwork in that room, but that "the movers could put anything anywhere."

At Tucker's federal criminal trial, there was evidence pre-sented that a forensic scientist was asked to examine the shot-gun and the two shells found in the apartment for fingerprints. The scientist testified that he had not examined the shotgun because it had not been properly packaged, and therefore he would not be able to determine whether the gun had any fin-gerprints on it belonging to Tucker or anyone else. The scien-tist testified that he had examined the shells for fingerprints but did not recover any.

The evidence related to fingerprints was referenced during counsels' opening and closing statements. During his opening statement, defense counsel said "there are no fingerprints in

[sic] that gun" and "the bottom line is that there's no prints in [sic] that firearm—that connect the firearm to Mr. Tucker or anybody else." During the government's closing statement, the prosecutor stated:

> [The defense said it] was going to show you that he did not possess the shotgun was that his fingerprints were not on the gun. Well, we now know that that was a misleading statement. We don't know if his fingerprints were ever on that gun. Unfortunately, this gun went through many hands. It was contaminated. And neither the detective or the forensic scientist who examined it felt that it was proper to examine an item of evidence for latent fingerprints when it's possibly been contaminated by other human hands. So we can't say one way or the other whether or not his fingerprints are on it. We don't know. That was a misleading statement from the defense.

Tucker's counsel responded:

> What is it that we said that was misleading? His fingerprints, Mr. Tucker's fingerprints, were definitely not found on that gun. The gun—they didn't even do an analysis on the gun. . . . But I guess we're being misleading about saying that his prints are not on the firearm. If you think we were—I was, I apologize. . . . But I don't think so. I don't think I was.

In addition, the prosecutor's closing argument contained comments about Dawn Alexander's "new boyfriend" or "new man." The prosecutor stated:

> [W]hy is he denying that he lived in the master bedroom? Why is he claiming that Dawn Alexander had a new boyfriend that she had moved in there? Well, because he has to explain why there's male posses-

sions in the master bedroom; right? He has to come up with some story because otherwise it's obvious the evidence points to the fact that he was residing in that bedroom. And why did he claim that he doesn't even know the new boyfriend's name? I mean, clearly this is not a true story. He doesn't even know the name of this alleged person who is living with him.

The prosecutor made several more references to Dawn Alexander's "new man" or "new boyfriend" throughout her closing argument.[1]

The prosecutor, in her closing argument, also commented on what the jury would have to find or believe, in order to convict Tucker. The prosecutor said she wanted "to point out a couple of things that you as jurors are going to have to find to be true if you decide that the defendant is not guilty. Because for you to say that he's not guilty, these are the things that you have to believe . . . ." The prosecutor went on to list various aspects of the defense theory of the case that the jury would "have to believe," and stated "[y]ou will have to believe that and that is not logical. It's not reasonable."

Defense counsel objected, arguing that the standard of proof was being shifted to the defense. The district court overruled the objection, stating that the jury had already been correctly instructed on the burdens of proof. The prosecutor continued:

---

[1]One of these was:

Is it believable to you as jurors that five days after moving in this apartment with Lorenzo Tucker that Dawn Alexander moved in a new boyfriend? Because that's what the defendant testified. The defendant testified that Dawn had a new boyfriend and that the new boyfriend was living there. They were all three living there together in this two-bedroom apartment.

> To find the defendant not guilty, remember, you
> have to have some kind of reasonable doubt. And the
> key word there is "reasonable" . . . . If you are gonna
> find him not guilty, you also have to believe that
> [lists various points of the defense argument] . . . .
> You will have to believe that. Because if you do not,
> that means that that [sic] the personal property in
> that master bedroom was the defendant's. It means
> it was his bedroom. It means that it was his shotgun.
> It means that he is guilty. You would also have to
> believe that the defendant did not lie. And do you
> believe that? . . . . Again, if you're going to have a
> doubt it must be reasonable; it must be based on rea-
> son.

Throughout her closing argument, the prosecutor reiterated
that it was the government's burden to prove all elements of
the charge beyond a reasonable doubt.

At several points during the trial, the district judge
instructed the jury on reasonable doubt and burdens of proof.
At the beginning of the trial, the district judge stated:

> The statements that the lawyers make now, as well
> as the arguments they present at the end of the trial,
> are not to be considered by you as evidence in this
> case or as a substitute for the instructions of law
> which will come only from me. Nevertheless, the
> statements and arguments of counsel are intended to
> help you understand the issues and the evidence as
> it comes in.

In addition, at the close of all the evidence, the district judge
reminded the jury that a defendant is presumed innocent, and
that the government has the burden of proving a defendant
guilty beyond a reasonable doubt. The district judge also
addressed the jury about the meaning of "proof beyond a rea-
sonable doubt." He instructed the jury that the verdict must be

based on the evidence and the law, as articulated by the court, and reminded the jury that the arguments and statements of the attorneys are not evidence.

The district court also instructed the jury on possession of the firearm, stating:

> A person has possession of something if the person knows of its presence and has physical control of it, or knows of its presence and has the power and intention to control it. *More than one person can be in possession of something if each knows of its presence and has the power and intention to control it.* Possession of a firearm can be actual or constructive. Actual possession means physical custody or actual physical dominion. Constructive possession exists when a person does not have actual possession but instead knowingly has the power and . . . intention at a given time to exercise dominion and control over an object, either directly or through another person or persons. To prove constructive possession, the government must show a sufficient connection between the defendant and the firearm to support an inference that the defendant exercised dominion and control over the item.

(emphasis added).

The court declined to give Tucker's proposed jury instruction on possession, which generally tracked the given instruction but omitted the line about it being possible for more than one person to be in "possession of something" and added the following language at the end:

> It is not the same as merely knowing the weapon is nearby. Therefore, mere proximity to the firearm, mere presence, or mere association with the person who does control the firearm is insufficient to sup-

port a finding of possession. A person's brief touching or handling of a firearm, without other steps to give him physical custody of or dominion and control over the firearm, is not sufficient to constitute actual or constructive possession.

Tucker was convicted of being a felon in possession of a firearm. At sentencing, the district judge considered, among other factors, Tucker's prior guilty plea for "Attempt Child Abuse and Neglect" in 2005. The copy of the Guilty Plea Agreement and the Judgment of Conviction before the district court did not set forth the facts to which Tucker pleaded guilty, but stated only that Tucker pleaded guilty to "ATTEMPT CHILD ABUSE AND NEGLECT (Category B Felony — NRS 193.330, 200.508), as more fully alleged in the charging document attached hereto as Exhibit '1.' " The copy of the Guilty Plea Agreement provided to the court did not have an attachment labeled "Exhibit 1" but was accompanied by a charging document, the "Information," which stated in pertinent part:

> LORENZO DARNELL TUCKER, III, the Defendant above named having committed the crime of ATTEMPT CHILD ABUSE AND NEGLECT (Felony — NRS 193.330, 200.508), on or about the 30th day of January, 2005, within the County of Clark, State of Nevada, contrary to the form, force and effect of statutes in such cases made and provided, and against the peace and dignity of the State of Nevada, did wilfully, unlawfully, feloniously and knowingly attempt to neglect, cause, or permit a child under the age of 18 years, to-wit: [Child][2], being approximately 6 years old, to suffer unjustifiable physical pain, or mental suffering, or by permitting the said [Child] to be placed in a situation where he might have suffered unjustifiable physical pain or

---

[2]The name of this individual has been redacted.

mental suffering, by repeatedly attempting to strike the said [Child] about the body with a belt.

The district court also considered the contents of the Presentence Report ("PSR") that was prepared by the government. The PSR recommended a sentence of 96 months' imprisonment, followed by three years' supervised release. The PSR reflected that Tucker committed the "felon in possession" offense after sustaining two felony convictions for crimes of violence—one for battery with substantial bodily harm,[3] and one for Attempt Child Abuse and Neglect. The PSR included the following comment on the 2005 conviction for Attempt Child Abuse and Neglect:

> According to the Nevada Parole and Probation presentence report on January 30, 2005, [Woman][4] left her children with Lorenzo Tucker, father of one of the children and who was the victim. When [Woman] arrived to pick up the children, she noticed a red mark on her son's face and asked him about it. The child advised that Lorenzo had told him to work on a "Hooked on Phonics" program on the computer, but that when he wasn't doing it exactly the way Lorenzo had told him to, he got a belt and beat him with it. Photos of the child showed bruises and belt marks to his face, throat, shoulders, arms, back, abdomen, groin, and buttocks. When [Woman] asked Lorenzo about the marks, he advised her that the child got a "beat down" because the child wasn't doing what he wanted him to do . . . . **This is a**

---

[3]The incident underlying the felony battery conviction took place in 1999. According to the PSR, Tucker "struck [a] female victim in the face with a drinking glass, causing substantial bodily harm." As a result, the victim was left with a "7cm laceration on her left cheek, a four centimeter laceration on her nose and a one centimeter laceration on her upper lip. Approximately 100 stitches were required to close the wounds."

[4]The name of this individual has been redacted to protect the individual's privacy.

**"crime of violence" as defined in U.S.S.G. § 4B1.2.**

(emphasis in original). The PSR also reflected several other criminal convictions and arrests for Tucker, including some for battery, destruction of property, and weapons possession, whose underlying incidents took place from 1992 to 1999.

In Tucker's sentencing memorandum, he objected to the PSR's determination that his prior conviction for Attempt Child Abuse and Neglect was a crime of violence, and argued that the PSR's recommended 96-month sentence was unreasonable.

The district court determined that the applicable Sentencing Guidelines range was 77 to 96 months, based on a base offense level of 24, seven criminal history points, and a criminal history category of IV. The court determined that Tucker's base offense was 24 because he had committed the felon in possession offense after receiving two felony convictions of a crime of violence, including the Attempt Child Abuse and Neglect conviction. The court determined that although Attempt Child Abuse and Neglect was not categorically a crime of violence under Nevada law, Tucker's conviction constituted a crime of violence under the modified categorical approach. In response to the defense objections, the court noted that even though much of the Information was boilerplate, its specific language—"by repeatedly attempting to strike the said [Child] about the body with a belt"—negated any inference that the act was a matter of negligence or was committed by someone else. Later in the sentencing proceeding, the district court reiterated that the evidence showed that Tucker "actually did beat the boy with a belt," and noted that "the reports indicate that this child was—had red marks on his head, his neck, his body from the belt." Defense counsel objected to the reference to the PSR, stating that if it "played any factor into the Court's mind what's stated in the PSR about the red marks about the neck and face because it's inap-

propriate under Ninth Circuit case law to consider what's in the PSR." The district judge appears to have agreed that he had to go "strictly on the Information," but indicated he could make an adjustment when considering the factors set forth in 18 U.S.C. Section 3553(a).

Defense counsel also noted that the Guilty Plea Agreement stated that Tucker was pleading guilty to Attempt Child Abuse and Neglect "as more fully alleged in *the charging document attached hereto as Exhibit 1*" (emphasis added), and argued that it was the prosecutor's burden to come forward with appropriate documentation of the conviction. The district court, nonetheless, took notice of the Information, commenting that it was "a copy of a certified copy which bears no indication of forgery or fabrication," mentioned Tucker by name, and listed the same charge to which Tucker had pleaded guilty (that is, "Attempt Child Abuse and Neglect"). The district court also noted that defense counsel did not suggest that the charging document was fabricated or amended, or that some other charging document applied. Accordingly, the district court determined the Information was reliable as the applicable charging document, and that it accurately described the offense to which Tucker had pled guilty.

The district court recognized that in calculating the sentencing guidelines, it was limited to admissible information including the plea agreement and the Information. However, it noted that "at the end of the day, as you are well aware, the Court can take into consideration other matters, including whether the defendant's criminal history is underrepresented and I can take into consideration all of the defendant's history, not just his conviction history." The district court reviewed Tucker's criminal history, as reflected in the PSR, and stated that a 96 months' sentence met the purposes of sentencing.

## II.

On appeal, Tucker raises five objections to his conviction and sentence: (1) there was insufficient evidence to demonstrate that he "possessed" the firearm, (2) the prosecutor committed misconduct during closing arguments, (3) the district court erred by refusing to give his proposed "mere presence" jury instruction, (4) the district court incorrectly calculated the sentencing guidelines, and (5) the sentence he received was substantively unreasonable.

### A.   Knowing Possession of the Shotgun

Where, as here, the defendant preserves his claim of insufficient evidence by making a motion under Federal Rule of Criminal Procedure 29 at the close of the evidence, we review de novo the sufficiency of the evidence supporting the conviction. *United States v. Ruiz*, 462 F.3d 1082, 1087-88 (9th Cir. 2006). We "determine whether 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *United States v. Nevils*, 598 F.3d 1158, 1163-64 (9th Cir. 2010) (en banc) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (italics omitted)).

**[1]** Tucker was convicted under the federal felon in possession statute, which "makes it unlawful for a person 'who has been convicted in any court of . . . a crime punishable by imprisonment for a term exceeding one year' to 'possess in or affecting commerce, any firearm or ammunition' which 'has been shipped or transported in interstate or foreign commerce.' " *Id.* (quoting 18 U.S.C. § 922(g)). To obtain a conviction, the government was required to prove: "(1) that the defendant was a convicted felon; (2) that the defendant was in knowing possession of a firearm [or ammunition]; and (3) that the firearm [or ammunition] was in or affecting interstate commerce." *Id.* at 1164 (alterations in original) (quoting *United States v. Beasley*, 346 F.3d 930, 933-34 (9th Cir.

2003)). Here, the only contested element of the federal felon in possession statute was the element of "knowing possession." We previously have stated that "[t]o establish that a defendant acted 'knowingly,' the prosecution need not prove that the defendant knew that his possession of a firearm was unlawful; the prosecution need only prove that the defendant consciously possessed what he knew to be a firearm." *Nevils*, 598 F.3d at 1163 (citing *Beasley*, 346 F.3d at 934).

Tucker argues that the government did not prove that he knowingly possessed the shotgun because, at most, the evidence showed that he was in close proximity to the shotgun on or about September 7. Tucker's theory is that Alexander was angry at him because they had broken up, and so she moved out of the apartment without anyone's knowledge, planted the shotgun, and then called Tucker's probation officer to "report" the alleged probation violation.

**[2]** The evidence indicates that Tucker was the *sole* adult occupant of the apartment on September 7, and the *only* person occupying the master bedroom and using the closet where the firearm was found. Tucker signed the apartment lease showing him as one of only two adult occupants of the apartment. Further, Tucker told Officer Flink that he lived in the master bedroom, the officers observed that there were only male belongings in the master bedroom, and there were prescription pill bottles bearing Tucker's name and mail addressed to Tucker in the master bedroom. Also, Alexander told the police that she was "moving out" of the apartment and was "en route to" Florida. This evidence is more than sufficient to support the jury's finding of possession. Moreover, Tucker's relationship to the shotgun is strengthened by Tucker's comments that the shotgun had previously been in the apartment and that his roommate used it for protection, as well as Officer Guiterrez's testimony that Tucker seemed to know what shotgun was at issue before the officers showed it to him. In sum, the jury could reasonably disbelieve Tucker's

explanations and conclude that Tucker knowingly possessed the gun.

Tucker seeks to analogize this case to several of our pre-*Nevils* decisions, in which we concluded that there was a lack of sufficient evidence regarding knowing possession. To the extent that these decisions survive our en banc opinion in *Nevils*, they are distinguishable because the evidence involved was so weak. For instance, in *Ruiz*, 462 F.3d at 1088, the firearms at issue were found in the "loft area, in the main part of the residence." *Id.* The defendants did not own or lease the premises where the contraband was found, and there was nothing else to suggest that the defendants controlled items in the area of the contraband. *Id.* at 1088-89. On these facts, we determined that the government could not prove knowing possession, and reversed the conviction. *Id.* at 1089; *see also United States v. Cazares*, 121 F.3d 1241, 1245 (9th Cir. 1997) (holding that the government failed to prove that the defendant possessed the guns where the defendant occupied the residence with several other people, and the government had not shown that the defendant knew the guns existed or that the guns were found in the bedroom occupied by the defendant); *United States v. Reese*, 775 F.2d 1066, 1074 (9th Cir. 1985) (holding that the evidence was insufficient to support a conviction for unlawful possession of firearms, where the defendant shared the house with his wife and the firearms were found behind a painting in the living room and under a pillow in the largest bedroom, but there was no evidence that the pillow under which the gun was found was the same pillow used by the defendant, or even that he used the bedroom in which the gun was found). By contrast, the evidence of knowing possession in this case is much stronger, and supports the jury's findings.

Tucker seeks to distinguish *United States v. Young*, 420 F.3d 915, 917 (9th Cir. 2005), on which the government relies. There, we upheld a jury finding that the defendant knowingly possessed a gun that was found inside his resi-

dence. In *Young,* the only other occupant of the residence, the defendant's girlfriend, had testified that she had moved out of the apartment and that she no longer had access to the apartment. *Id.* Tucker contrasts *Young* with this case, and argues that because there was no testimony that Alexander had completely moved out and no longer had access to the apartment, *Young* is inapposite.

Tucker's interpretation of *Young* is overly simplified. Our decision did not depend *solely* on the testimony of the defendant's girlfriend that she had already moved out of the residence by the time the gun was found. *See id.* We also considered letters addressed to the defendant and other personal belongings to suggest that he alone occupied the residence. *Id.* Similarly, here, Alexander's testimony is just one among many pieces of evidence that support the jury's determination that Tucker possessed the shotgun. Tucker was free to argue these distinctions to the jury, but ultimately the jury may discount his assertions in favor of evidence of his control over the apartment.

## B. Prosecutor's Closing Statement

When a defendant fails to object to alleged prosecutorial misconduct, the court reviews for plain error. *United States v. Geston,* 299 F.3d 1130, 1134 (9th Cir. 2002). Where an objection is raised in the trial court and overruled, the court reviews for abuse of discretion. *United States v. Tam*, 240 F.3d 797, 802 (9th Cir. 2001). "The defendant must show that it is more probable than not that the misconduct materially affected the verdict." *Id.* (internal quotation omitted).

Prosecutors can argue reasonable inferences based on the record, *United States v. Cabrera*, 201 F.3d 1243, 1250 (9th Cir. 2000), and "have considerable leeway to strike 'hard blows' based on the evidence and all reasonable inferences from the evidence," *United States v. Henderson*, 241 F.3d 638, 652 (9th Cir. 2000) (citation omitted). "A prosecutor

may express doubt about the veracity of a witness's testimony [and] may even go so far as to label a defendant's testimony a fabrication." *Cabrera*, 201 F.3d at 1250 (internal quotation marks omitted). "[C]omments intended to highlight the weaknesses of a defendant's case do not shift the burden of proof to the defendant where the prosecutor does not argue that a failure to explain them adequately requires a guilty verdict and reiterates that the burden of proof is on the government." *United States v. Vaandering*, 50 F.3d 696, 701-02 (9th Cir. 1995) (citations and quotations omitted). "The trial judge has broad discretion in controlling closing argument, and improprieties in counsel's arguments to the jury do not constitute reversible error unless they are so gross as probably to prejudice the defendant, and the prejudice has not been neutralized by the trial judge." *United States v. Navarro*, 608 F.3d 529, 535-36 (9th Cir. 2010) (internal quotations omitted).

### 1. *Prosecutor's Comments About Alexander's "New Boyfriend" and "New Man"*

**[3]** Tucker argues, for the first time on appeal, that the prosecutor's comments about Alexander's "new man" or "new boyfriend" were not based on evidence that had been presented at trial. Tucker also takes issue with the prosecutor's repeated comments that Tucker lied. We determine, however, that the prosecutor's statements were reasonable inferences drawn from the evidence presented. When Tucker was cross-examined at the related state court hearing, he testified that he slept in the small bedroom—the one that the officers testified was filled with children's toys—and that Alexander, with whom he was living, was "mad" at him because he "didn't want to be with her." He further asserted that Alexander "had a boyfriend." This testimony — contrasted with the evidence that Tucker and Alexander had recently moved into the apartment, and that Tucker was still living in the apartment—allowed the prosecutor to infer that Tucker lied in the state court hearing when he suggested that the personal effects and clothing in the master bedroom

belonged to Alexander's "new" boyfriend. It was not plain error for the district court to allow these comments.

## 2. *Prosecutor's Statements Regarding Fingerprints*

[4] Also for the first time on appeal, Tucker argues that the prosecutor committed misconduct when she referred to the fingerprint portions of defense counsel's opening statement as "misleading." The prosecutor's comment highlighted the distinction between saying "Tucker's fingerprints are not on that gun" and "we do not know whether Tucker's fingerprints are on that gun." This distinction was supported by the forensic expert's testimony that he did not know whose fingerprints, if any, were on the shotgun. Thus, although "misleading" might be a slightly harsh adjective, it was not inaccurate. In contrast to the case cited by Tucker, the adjective was limited to one particular *statement* by defense counsel, rather than directed at defense counsel *himself. See United States v. Rodrigues*, 159 F.3d 439, 449 (9th Cir. 1998), opinion amended on denial of rehearing at 170 F.3d 881 (9th Cir. 1999).[5] More importantly, any prejudice was dissipated by the back-and-forth exchange between the prosecutor's closing statement and defense counsel's closing statement. We determine that the prosecutor's "misleading" comment, examined in context, was innocuous and the district court did not commit plain error by allowing it.

## 3. *Prosecutor's Statements Regarding the Burden of Proof*

Tucker argues that the prosecutor intentionally shifted the burden of proof by listing various facts that the jury would

---

[5]In *Rodrigues*, the prosecutor told the jury that defense counsel "tried to deceive you from the start," had "tried to pretend that this case is about" something it was not about, had "tried to introduce a number of nonissues, false issues" and had "harped" on something that was "flatout untrue." *Rodrigues*, 159 F.3d at 449.

have to "find" if it were to determine that Tucker was "not guilty." Tucker contends that the district court made matters worse by commenting, "I have instructed the jury on the burdens of proof already. However, this is argument. And I believe that it is within bounds. So you may proceed."

**[5]** The record shows that the prosecutor's comments about what the jury "must find" were made in the context of explaining why the jury should reject Tucker's version of events, and only *after* the prosecutor already had said that the government was required to prove beyond a reasonable doubt that Tucker was guilty of possession of a firearm. In addition, the prosecutor reiterated on several occasions that the government had the burden of proof. We further agree with the district court that the prosecutor's comments were only argument, and note that the district court correctly instructed the jury on the proper standard. While the prosecutor's phrasing was inartful, his meaning is evident from context: to believe the defendant's account, the jury would have to believe implausible aspects of his testimony. This sort of argumentation is permissible. *See Vaandering*, 50 F.3d at 701-02. Accordingly, the prosecutor's comments did not constitute misconduct, and the district court did not err by allowing them. Furthermore, even if the comments were improper, the court's statements and instructions to the jury neutralized any potential prejudice. *See Tam*, 240 F.3d at 802 (holding that even if the prosecutor's burden-shifting statements during closing argument were improper, they were rendered harmless as a result of the district court's comments and instructions to the jury).

## C.  Tucker's Proposed "Mere Presence" Jury Instruction

A party's claim that the district court's instructions did not adequately cover the theory of the defense is reviewed de novo. *United States v. Howell*, 231 F.3d 615, 629 (9th Cir. 2000). "A defendant is entitled to have the judge instruct the

jury on his theory of defense, provided that it is supported by law and has some foundation in the evidence." *United States v. Mason*, 902 F.2d 1434, 1438 (9th Cir. 1990). A court may reject a defendant's theory of the case instruction if the other instructions given in their entirety cover the defense theory. *United States v. Kenny*, 645 F.2d 1323, 1337 (9th Cir. 1981). "So long as the instructions fairly and adequately cover the issues presented, the judge's formulation of those instructions or choice of language is a matter of discretion." *United States v. Echeverry*, 759 F.2d 1451, 1455 (9th Cir. 1985). "A district court may properly refuse to give a 'mere presence' instruction when the government's case rests on 'more than just a defendant's presence, and the jury is properly instructed on all elements of the crime . . . .' " *United States v. Reed*, 575 F.3d 900, 925 (9th Cir. 2009) (alteration in original) (quoting *United States v. Negrete-Gonzales*, 966 F.2d 1277, 1282 (9th Cir. 1992)).

[6] Tucker argues that his only link to the firearm was his presence in the apartment and his statements that he had briefly handled the firearm on an earlier date, and therefore the district court should have issued a "mere presence" or "mere handling" jury instruction. The record shows that the government's case was *not* limited to evidence regarding presence or handling. The government presented evidence that (1) Tucker was the only adult occupant of the apartment on September 7; (2) the gun was in the same bedroom that Tucker was using, near his personal effects; (3) Tucker knew what gun the officers were talking about before they showed it to him on September 7; and (4) Tucker had handled the gun in the past and thought his fingerprints would be on it. This evidence goes beyond "mere presence," and makes a mere presence instruction unnecessary. *See United States v. McKnight*, 953 F.2d 898, 903 (5th Cir. 1992) (holding that a mere presence instruction was unnecessary where defendant owned and lived in the house where contraband was found because "[t]he dominion and control associated with owning *and* living in a small, open house . . . is utterly inconsistent with the

legal conclusion that [the defendant] was '*merely* present.' " (italics in original)).

We recognize that the facts in this case fall somewhere between cases where we have required a presence-based instruction, such as *Negrete-Gonzales*, and those where we have not required the instruction, such as *Howell*. *Compare Howell*, 231 F.3d at 629 (holding that a mere presence instruction was not necessary where there was witness testimony that the defendant had placed the cocaine in the witness's bag, instructed the witness to carry it, and promised the witness money for her role in its delivery, and the defendant had confessed to picking up the cocaine), *with Negrete-Gonzales*, 966 F.2d at 1277, 1282 (holding that defendant was entitled to a mere presence instruction where the government's case was based on evidence that he accompanied a witness to a parking lot where some drug sale negotiations took place and performed some "countersurveillance" activity, and that he was physically in the house—but not in the relevant bedroom—when the drug sale took place). On balance, we determine that the facts are closer to those in *Howell*, and therefore a mere presence instruction was not necessary.

**[7]** We conclude that the district court did not err in refusing to give the mere presence instruction, particularly as the jury was properly instructed on the elements of the felon in possession statute. *See Negrete-Gonzales*, 966 F.2d at 1282 (stating that "[i]f the government's case is based on more than just a defendant's presence, and the jury is properly instructed on all elements of the crime, then a "mere presence" instruction is unnecessary.").**[6]** Pursuant to these instructions, the jury could not find Tucker guilty based on his mere presence or handling of the shotgun. Rather, the jury had to find that Tucker "knowingly ha[d] the power and . . . intention at a

---

**[6]**Tucker does not dispute that the jury was properly instructed on the elements of the crime.

given time to exercise dominion and control" over the shotgun and that the government had shown "a sufficient connection" between Tucker and the shotgun "to support an inference that [Tucker] exercised dominion and control" over it. We conclude that the jury instructions adequately covered Tucker's theory of defense, and therefore the district court did not commit reversible error.

### D. Calculation of Sentencing Guidelines, Using Tucker's Prior Conviction for Attempt Child Abuse and Neglect as a Conviction for a "Crime of Violence"

We "review the district court's interpretation of the Sentencing Guildelines de novo, the district court's application of the Guidelines to the facts for abuse of discretion, and the district court's factual findings for clear error." *United States v. Garro*, 517 F.3d 1163, 1167 (9th Cir. 2008) (italics omitted). We review de novo a district court's determination that a prior conviction qualifies as a crime of violence. *United States v. Rodriguez-Guzman*, 506 F.3d 738, 740 (9th Cir. 2007). We use an abuse-of-discretion standard when reviewing a district court's determination about whether a particular item is sufficiently reliable to be considered at sentencing. *United States v. Pinto*, 48 F.3d 384, 389 (9th Cir. 1995).

Here, the district court properly used the modified categorical approach to determine whether Tucker's prior conviction for Attempt Child Abuse and Neglect qualified as a "crime of violence." *See United States v. Contreras-Salas*, 387 F.3d 1095, 1096-97 (9th Cir. 2004). The Supreme Court reaffirmed the use of this approach in *Johnson v. United States*, 130 S. Ct. 1265, 1273 (2010):

> When the law under which the defendant has been convicted contains statutory phrases that cover several different generic crimes, some of which require violent force and some of which do not, the "modified categorical approach" that we have approved,

> *Nijhawan v. Holder*, 129 S. Ct. 2294, 2302 (2009), permits a court to determine which statutory phrase was the basis for the conviction by consulting the trial record—including charging documents, [and] plea agreements . . . .

*Id.* When using the modified categorical approach, we look to the factual description in the charging document to determine whether the crime to which a defendant pled guilty constitutes a crime of violence. *See e.g.*, *Penuliar v. MuKasey*, 528 F.3d 603, 610 (9th Cir. 2008); *Contreras-Salas,* 387 F.3d at 1097-98.

Tucker argues that the district court improperly relied on the PSR's description of the incident giving rise to his Attempt Child Abuse and Neglect conviction, pointing to the district judge's comments during sentencing about facts contained in the PSR but not in the Information. For example, the district judge stated that Tucker had beaten the child with a belt, and referenced the red marks on the child. However, the court twice clarified that it was relying only on the Information when calculating the applicable guidelines. The issue thus is whether the Information for Attempt Child Abuse and Neglect compels a finding of a crime of violence under the modified categorical approach.

**[8]** On first read, the language in the Information "by permitting [Child] to be placed in a situation where he might have suffered unjustifiable physical pain or mental suffering" might be problematic, as it could describe a non-violent crime. However, this possibility is foreclosed by the closing, qualifying phrase in the Information—"by repeatedly attempting to strike the [Child] about the body with a belt"—which clarifies that Tucker personally attempted to strike the child, rather than placed the child in a position where he might be struck by someone else.

Tucker's attempt to equate the Information in this case with the one in *Contreras-Salas* is not persuasive. In *Contreras-*

*Salas*, the Information covered two defendants, described several ways in which the offense could have been committed, and used the conjunction "and/or." *Contreras-Salas*, 387 F.3d at 1098 n.2. Here, by contrast, the description of factual violence at the end of the Information makes it clear that Tucker pleaded guilty to his *own* volitional, violent conduct. The Information cannot be fairly read as allowing an alternative scenario whereby Tucker could have pled guilty to an offense that did *not* involve Tucker himself striking the child.

**[9]** Tucker also takes issue with the district court's assumption that the Information provided was the same "charging document" referenced in the plea agreement. However, Tucker does not offer any factual allegations suggesting that the Information submitted in the certified record was not the same Information to which Tucker pleaded. As the district judge noted, the charge of Attempt Child Abuse and Neglect was the same in the Information as in the Guilty Plea Agreement, both documents were certified copies from the Clerk of Court, and there was no evidence to suggest they were fabricated. Tucker did not point to a different Information that applied to his guilty plea, or otherwise suggest a reason why the Information being referenced might be inapplicable or unreliable. Under these circumstances, the district court did not abuse its discretion in relying on the Information and concluding that Tucker pleaded guilty to the violent crime described therein. *See United States v. Strickland*, 601 F.3d 963, 968-69 (9th Cir. 2010) (holding that the district court properly considered a docket sheet when applying the modified categorical approach because there were sufficient indicia of reliability and the defendant had not offered any reasonable ground for questioning the document).

### E. Reasonableness of Sentence

We "consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard," taking into account "the totality of the circumstances, including the

extent of any variance from the Guidelines range." *Gall v. United States*, 552 U.S. 38, 51 (2007). "In determining the relevant facts, sentencing judges are not restricted to information that would be admissible at trial. Any information can be considered, so long as it has 'sufficient indicia of reliability to support its probable accuracy.' " *United States v. Notrangelo*, 909 F.2d 363, 364-65 (9th Cir. 1990) (quoting U.S.S.G. § 6A1.3, comment).

  **[10]** Tucker argues that his sentence of 96 months' incarceration is substantively unreasonable and greater than necessary, and that he is being punished for his past rather than for his conduct in this case. We disagree. The district court properly considered Tucker's violent criminal history, including his conviction of Attempt Child Abuse and Neglect. The evidence of Tucker's good deeds and deep sense of responsibility to his family, although admirable, did not, for the district court, negate his pattern of violent criminal behavior.[7] On balance, it is clear that the district court, having correctly calculated the applicable Guidelines, reasonably based its sentence on Tucker's lengthy history of convictions for crimes involving violent behavior.

---

  [7]Our conclusion is not undermined by Tucker's argument that the trial judge "mistakenly relied on what he claimed was 'evidence' at trial that Mr. Tucker's hand was in a cast when he was arrested in this case because he 'broke [it] on [Alexander's] face.' " Tucker is correct that there was no evidence at trial to suggest that he broke his hand on Alexander's face. However, the district court did not rely on any such evidence in issuing Tucker's sentence. The court specifically stated that the "actual record of convictions" was sufficient to overrule Tucker's objection to the PSR's statement that he was a danger to the community.

  Moreover, the medical records Tucker presented showed that he broke his hand by striking someone else, not Alexander. This evidence is in keeping with the other indicia of Tucker's violent nature and behavior. Therefore, even if the trial judge *had* relied on the violent manner in which Tucker broke his hand, the judge's mistake as to the identity of the victim likely would have been harmless error because it would not have changed the significance of the incident in a way that impacted Tucker's sentence.

## III.

In conclusion, we affirm Tucker's conviction because the government established that Tucker "knowingly possessed" the shotgun, the prosecutor's comments during closing argument did not shift the burden of proof, and Tucker was not entitled to a "mere presence" jury instruction. We affirm his sentence because the district court correctly calculated the sentencing guidelines, correctly determined that Tucker's prior conviction for Attempt Child Abuse and Neglect was a "crime of violence," and imposed a reasonable sentence.

**AFFIRMED.**