**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee*, v. ALFRED VELAZQUEZ, *Defendant-Appellant*. | No. 19-50099<br><br>D.C. No. 3:17-cr-03707-BAS-1<br><br>OPINION |

Appeal from the United States District Court
for the Southern District of California
Cynthia A. Bashant, District Judge, Presiding

Argued and Submitted July 8, 2020
Pasadena, California

Filed June 23, 2021

Before: Richard A. Paez and Bridget S. Bade, Circuit
Judges, and Eric F. Melgren,[*] District Judge.

Opinion by Judge Paez;
Dissent by Judge Bade

---

[*] The Honorable Eric F. Melgren, United States District Judge for
the District of Kansas, sitting by designation.

## SUMMARY[**]

### Criminal Law

The panel vacated a conviction for importing controlled substances into the United States, and remanded for a new trial, in a case in which the defendant testified he did not know the car he was driving contained drugs.

During closing argument, the prosecutor compared the reasonable doubt standard to the confidence one needs to "hav[e] a meal" or "travel to . . . court"—without worrying about the "possib[ility]" that one will get sick or end up in an accident.  The panel held that the prosecutor engaged in misconduct by trivializing the reasonable doubt standard and, as a result, caused the defendant substantial prejudice. The panel wrote that the prosecutor's comments regarding the government's burden of proof diverged significantly from what is required at trial, and was troubled by the suggestion that reasonable doubt can be compared to an "everyday" experience.  The panel was not convinced that the district court's providing the correct instruction and admonishing the jury earlier during closing argument sufficiently neutralized the prejudice. The panel did not believe that the evidence demonstrating the defendant's knowledge of the drugs was so overwhelming that the prosecutor's misstatements were harmless.

Dissenting, Judge Bade agreed that the prosecutor's comments were at best unhelpful, and potentially misleading, but wrote that the record overwhelmingly

---

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

establishes that the comments did not affect the verdict and, thus, the defendant's due process rights were not violated.

## COUNSEL

Carlton F. Gunn (argued), Pasadena, California, for Defendant-Appellant.

Benjamin Holley (argued) and Nicole Ries Fox, Assistant United States Attorneys; Daniel E. Zipp, Chief, Appellate Section, Criminal Division; Robert S. Brewer, Jr., United States Attorney; United States Attorney's Office, San Diego, California; for Plaintiff-Appellee.

**OPINION**

PAEZ, Circuit Judge:

A jury convicted Alfred Velazquez of importing controlled substances into the United States, in violation of 21 U.S.C. § 960. At trial, Velazquez took the stand and testified he did not know the car he was driving contained drugs—what is sometimes referred to as the "blind mule" defense.

Velazquez asserts multiple errors at trial, but we need focus only on one. During closing argument, the government compared the reasonable doubt standard to the confidence one needs to "hav[e] a meal" or "travel to . . . court"—without worrying about the "possib[ility]" that one will get sick or end up in an accident. Velazquez claims that this improper argument, and the district court's failure to cure it, caused him prejudice. We agree. We have jurisdiction under 28 U.S.C. § 1291. We vacate Velazquez's conviction and remand for a new trial.

**I.**

In July 2017, Velazquez was driving from Mexico into the United States when he encountered Customs and Border Protection Officer Sean Hanlon at the Otay Mesa Port of Entry. Velazquez provided his temporary driver's license and told the officer he was going to the Department of Motor Vehicles (DMV) to obtain permanent identification. The officer asked Velazquez who owned the car, and Velazquez said the car belonged to his cousin.

Velazquez was sent to secondary inspection. As the officer took Velazquez to secondary inspection, he understood Velazquez to say: "I don't know why you're

searching me or bothering me. I'm just going to meet up with my mom." The officer asked Velazquez about his earlier statement about going to the DMV. Velazquez explained that "he was going to pick up his mom and then going to go to the DMV to hang out."

The officer searched the car in secondary inspection. The officer opened the hood and saw that the engine "was heavily tampered." Velazquez gave the officer permission to open the intake manifold, where the officer found two packages. Later testing revealed the packages contained over 2,000 grams of a mixture and substance containing fentanyl and heroin, which was worth almost $150,000.

Velazquez was arrested, and Department of Homeland Security Agent Kevin Day interrogated him. Velazquez denied knowing about the drugs.

## A. The Trial

Velazquez was indicted for importation of fentanyl and importation of heroin. Velazquez pled not guilty and proceeded to trial.

### 1. The Government's Case-in-Chief

At trial, the government presented two main witnesses, Officer Hanlon and Agent Day. Officer Hanlon—the officer who first encountered Velazquez at the port of entry—testified about his initial observations of Velazquez. He testified that Velazquez "couldn't maintain eye contact, . . . was continuously readjusting in his seat, and . . . his hands were shaking when he would hand me documents or his ID." He also testified that the car was very clean and had little "personalization." On cross-examination, however, the officer acknowledged that there were several personal items

in the car, such as a CD and "some other personal items" in the glove box, a can on the floor, a personal jacket or checkered top, a sun visor block in the back of the car, and a "shirt or some such thing that[ was] kind of strewn" in the back.

Agent Day—the interviewing agent—also testified. He testified about various documents, including registration papers showing that the car Velazquez was driving had been purchased for $300 two months before he was stopped at the border, from a seller identified as "Operadora de Autos." Agent Day also testified about various records showing Velazquez had crossed the border over sixty times, with about half of the entries resulting in secondary inspections.

Defense counsel asked Agent Day whether he was aware of the concept of "blind mules." Agent Day explained he had heard of blind mules with "magnet loads of marijuana," but "[had] not heard of any hard narcotic blind mules, and I've not heard of any where the drugs are concealed inside the engine." Agent Day provided additional testimony on redirect examination, explaining that blind mules typically involve marijuana, usually hidden underneath a vehicle in a way that is easily accessible, usually with a GPS monitor attached.

### 2. Velazquez's Testimony

After the government rested its case-in-chief, Velazquez testified in his defense. He testified that he had been living with his girlfriend, Bella, in Tijuana, Mexico, but would frequently travel to the United States to help at his parents' nursery and with sales at swap meets. He met Bella through her uncle, Juan, who worked at a car wash Velazquez used in Tijuana. He also testified that a man named Rayo lived

across the street from Juan and Bella and identified all their residences in photographs.

Velazquez also testified that Bella became distant shortly before his arrest and began seeing her former boyfriend Emmanuel, whose father was involved "big time" in drugs and controlled a large area in Tijuana. Velazquez also heard rumors that Juan and Rayo were mixed up in drugs. Bella's father had been the victim of a drug-related murder.

Velazquez also testified about the car he was driving when he was arrested. He said he purchased it for $1,500 from a man he met through Juan. He testified that he parked the car in a parking lot Juan had told him about, and both Juan and Rayo knew Velazquez parked the car there. When Velazquez helped his parents in the United States, he parked the car at their nursery and used their truck for deliveries and other business. Bella knew where the nursery was located because she had asked Velazquez to send her a photograph of the car at the nursery, and the photograph had a "pin location" that provided its geographic location.

Velazquez also testified about the events leading up to his arrest. He said that the night before the arrest, he had had a fight with Bella, but she later met him at Juan's house to make up. Velazquez spent the night at Juan's house. The next day, Velazquez drove his car to the border to "take care of [] things" at the DMV and then head over to his parents' house. He clarified that what he meant when he told Officer Hanlon about going to the DMV and hanging out with his mother was that he was going to the DMV and then going to see his mother. He admitted that he lied when he said the car belonged to his cousin, but that he did so because border officers had confiscated a car his brother had given him just

two weeks earlier.[1]  He denied knowing anything about the drugs.

### 3.  Jury Instruction and Closing Argument

Just before closing argument, the court instructed the jury on reasonable doubt.  The court stated:

> Proof beyond a reasonable doubt is proof that leaves you firmly convinced the defendant is guilty.  It is not required that the government prove guilt beyond all possible doubt.  A reasonable doubt is a doubt based on reason and common sense and is not based purely on speculation.  It may arise from a careful and impartial consideration of all the evidence or from a lack of evidence.  If after a careful and impartial consideration of all the evidence you are not convinced beyond a reasonable doubt that the defendant is guilty, it is your duty to find the defendant not guilty.

The prosecutor then began his closing argument and described the reasonable doubt standard: "Reasonable doubt is something that you make decisions about every single day."  Defense counsel objected.  The district court did not sustain or overrule the objection, but it did instruct the jury to follow its instruction on reasonable doubt and "not as to what any attorney says the standard of reasonable doubt is."

---

[1] Agent Day testified he was "familiar" with this seizure.  Velazquez gave Agent Day the same reason for lying about the car's ownership during his post-arrest statement, but the district court excluded that testimony as hearsay when defense counsel proffered it.

The prosecutor then gave more examples of reasonable doubt:

> It is something that you do every single day. So things like getting up, having a meal. You're firmly convinced that the meal you're going to have is not going to make you sick. But it is possible that it might not—that it might actually make you sick.
>
> You got in your car or you travel to the court today. It is possible that you may have gotten in an accident, but you are firmly convinced that—the likelihood that you'll be able to get to court safely.

During rebuttal, the prosecutor again told the jury that reasonable doubt "is something that you use every single day in your life." Defense counsel objected that the prosecutor's argument "diminishes the burden of proof." This time, the district court overruled the objection and did not admonish the jury.

### 4. Verdict and Judgment

The jury returned a guilty verdict. The court subsequently sentenced Velazquez to 151 months in prison. Velazquez timely appealed.

## II.

Velazquez contends that, despite the court's instruction regarding reasonable doubt, the prosecutor trivialized the standard during closing argument and substantially prejudiced him. We agree.

A prosecutor's misstatements of law during closing argument provide grounds for reversal. *United States v. Segna*, 555 F.2d 226, 230–32 (9th Cir. 1977). We will not reverse a conviction, however, unless the prosecutor's statements during closing argument "are so gross as probably to prejudice the defendant, and the prejudice has not been neutralized by the trial judge." *United States v. Birges*, 723 F.2d 666, 672 (9th Cir. 1984) (quoting *United States v. Parker*, 549 F.2d 1217, 1222 (9th Cir. 1977)). To show prejudice, "[t]he defendant must show that it is more probable than not that the misconduct materially affected the verdict." *United States v. Tucker*, 641 F.3d 1110, 1120 (9th Cir. 2011) (quoting *United States v. Tam*, 240 F.3d 797, 802 (9th Cir. 2001)); *Segna*, 555 F.2d at 232. In close cases, however, we will not hesitate to reverse a conviction on the basis of a prosecutor's misstatement of the law, even when reviewing for plain error. *See Segna*, 555 F.2d at 230–32.

On multiple occasions, we have reviewed de novo whether a challenged prosecutorial comment infringes on a defendant's Fifth Amendment rights. *United States v. Mikhel*, 889 F.3d 1003, 1060 (9th Cir. 2018) (reviewing de novo prosecutor's comment on defendant's failure to testify); *United States v. Inzunza*, 638 F.3d 1006, 1023 (9th Cir. 2011) (reviewing de novo prosecutor's comment on failure to call witness); *United States v. Reyes*, 660 F.3d 454, 461 (9th Cir. 2011); *United States v. Perlaza*, 439 F.3d 1149, 1169 n.22 (9th Cir. 2006). We recently acknowledged, however, potential intra-circuit conflict on the standard of review for challenges to prosecutorial comments, suggesting that we might instead review the court's overruling of an objection to such comments "for abuse of discretion." *United States v. Wijegoonaratna*, 922 F.3d 983, 989 (9th Cir. 2019) (quoting *United States v. Santiago*, 46 F.3d 885, 892 (9th Cir. 1995)). Nonetheless, even if an intra-circuit

conflict exists, "we are not prompted to call for our court to revisit the broader issue en banc" because we reach the same conclusion under either standard of review. *Id.* (citation and brackets omitted); *see also Segna*, 555 F.2d at 230–32 (reversing conviction, even on plain error review, in a close case involving a prosecutor's misstatement of the law). Here, we conclude the prosecutor engaged in misconduct by trivializing the reasonable doubt standard and, as a result, caused Velazquez substantial prejudice.  We further conclude that the court failed to neutralize the prejudice.

In a criminal trial, "no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof— defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense." *Jackson v. Virginia*, 443 U.S. 307, 316 (1979).  This standard of proof is "indispensable" to our criminal justice system and preserves three distinct interests. *In re Winship*, 397 U.S. 358, 364 (1970).  First, it protects the defendant's interest in being free from unjustified loss of liberty and the stigmatization that results from conviction. *Id.* at 363.  Second, it engenders community confidence in the administration of justice by giving "concrete substance" to the presumption of innocence.  *Id.* at 363–64.  Third, it ensures "that the moral force of the criminal law [is not] diluted by a standard of proof that leaves people in doubt whether innocent men are being condemned."  *Id.* at 364. Thus, for a jury to convict a defendant under this high burden of proof, the jury must "reach a subjective state of *near certitude* of the guilt of the accused." *Jackson*, 443 U.S. at 315 (emphasis added).

In the final moments of a trial, the government's principal purpose is to persuade the jury it has met its burden to show guilt beyond a reasonable doubt.  Even against this

high burden, however, a prosecutor, as a representative of the government, wields considerable influence over a jury. *See Berger v. United States*, 295 U.S. 78, 88 (1935). With this power, a prosecutor can easily mislead the average juror into adopting his or her personal view of the law, even when that view diverges from the court's own instruction. *See id.*; *see also United States v. Parr-Pla*, 549 F.2d 660, 662 (9th Cir. 1977) (per curiam) ("It is the duty of the court, not counsel, to advise the jury as to the law . . . ."). Because jurors can be swayed by such mischaracterizations, a prosecutor must be especially wary of making any comments that could, in effect, reduce its burden of proof.

The prosecutor's comments here regarding the government's burden of proof diverged significantly from what we require in a criminal trial. The prosecutor compared the reasonable doubt standard to making decisions like going for a drive or eating a meal—with the confidence that things will not go awry. Such decisions involve a kind of casual judgment that is so ordinary and so mundane that it hardly matches our demand for "near certitude" of guilt before attaching criminal culpability. *See Jackson*, 443 U.S. at 315. These decisions do not typically even involve an objective calculation of risk, but rather rest on the fallacious comfort that because these activities did not result in chaos yesterday, they will not today. Such examples are highly inappropriate and misleading. *See People v. Nguyen*, 46 Cal. Rptr. 2d 840, 844–45 (Ct. App. 1995) (holding that prosecutor's statements equating reasonable doubt with decisions like getting married or changing lanes while driving were improper).

We are also troubled by the suggestion that reasonable doubt can be compared to an "everyday" experience. The process of adjudicating guilt is a major and meticulous

undertaking. People do not, "every single day," bear the solemn task of examining evidence and determining an accused's guilt. The comparison—to reflexive, quotidian decisions like "getting up," "having a meal," and "travel[ing] to . . . court"—is flagrant and seriously distorts the standard.[2] The government's analogies reflect an effort— even if unintentional—to "reduce [its] burden of proof." *See United States v. Henry*, 545 F.3d 367, 383 (6th Cir. 2008) (holding that prosecutor's suggestion to the jurors that the decision of whether to convict the defendant was the same as deciding whether to recommend their child to take a job

---

[2] The examples deployed here are worse and involve less deliberation, scrutiny, and advice-seeking than those that have already been heavily criticized, such as "choosing a spouse, a job, a place to live, and the like." *Victor v. Nebraska*, 511 U.S. 1, 24 (1994) (Ginsburg, J., concurring) (quoting Fed. Jud. Ctr. Pattern Crim. Jury Instr. No. 21 (1987)). A committee of distinguished federal judges, reporting to the Judicial Conference of the United States, had criticized formulations containing such examples because they "generally involve a very heavy element of uncertainty and risk-taking" and are thus "wholly unlike the decisions jurors ought to make in criminal cases." *Id.* Justice Ginsburg echoed these concerns, calling such examples "unhelpful." *Id.* So have we, describing the concerns as "well stated." *United States v. Jaramillo-Suarez*, 950 F.2d 1378, 1386 (9th Cir. 1991), *as amended on denial of reh'g* (Dec. 16, 1991). State courts are also in accord with this view. *See, e.g.*, *Nguyen*, 46 Cal. Rptr. 2d at 844–45; *Holmes v. State*, 972 P.2d 337, 343 (Nev. 1998) ("[P]rosecutorial commentary analogizing reasonable doubt with major life decisions such as buying a house or changing jobs is improper because these decisions involve elements of uncertainty and risk-taking and are wholly unlike the kinds of decisions that jurors must make in criminal trials."). Commentators, too. *See, e.g.*, Michael D. Cicchini, *Instructing Jurors on Reasonable Doubt: It's All Relative*, 8 Cal. L. Rev. Online 72, 74–75 (2017).

with him was improper).  District courts in this circuit have rightfully admonished such analogies.[3]

The government acknowledges, in a footnote, that courts have warned against such analogies to everyday decisions because they are "easily susceptible to erroneous interpretation."  Gov't Br. at 57 n.3 (quoting *Escobar v. Williams*, 774 F. App'x 403, 403–04 (9th Cir. 2019)).  It nonetheless argues that, in context, the prosecutor did not err because he also quoted language directly from the court's instruction on the reasonable doubt standard, an instruction Velazquez does not contest.  That instruction stated, in part, that "[p]roof beyond a reasonable doubt is proof that leaves you firmly convinced the defendant is guilty."  To be sure, the prosecutor tracked some of this language and projected the instruction on a screen during his closing argument.  But he also mischaracterized the court's directive to be "firmly convinced" by analogizing it to everyday judgment and scrutiny.  By doing so, the prosecutor's comments provided the only concrete examples of the cryptic phrase "firm conviction," and, as a result, diluted its meaning.  In other words, the phrase has less significance when it is equated to

---

[3] *See, e.g.*, *United States v. Ramos*, No. 13-cr-00403, 2016 WL 844789, at \*7–9 (C.D. Cal. Feb. 29, 2016), *aff'd in part, vacated in part*, 717 F. App'x 693, 695 (9th Cir. 2017); *Horton v. McWean*, No. 10-cv-6428, 2012 WL 6110488, at \*23 (C.D. Cal. Nov. 5, 2012) ("[The prosecutor's] comparison of the reasonable doubt standard to everyday decisions made while crossing a street or stopping at a red light arguably trivialized the standard."), *report and recommendation adopted*, No. 10-cv-6428, 2012 WL 6131200 (C.D. Cal. Dec. 10, 2012); *Suy v. Pliler*, No. 02-cv-2765, 2007 WL 4200451, at \*5 (E.D. Cal. Nov. 21, 2007) ("[T]he prosecutor's reference to everyday decisions, such as what grade to give a school assignment or whether a motorist is guilty of a traffic violation if he exceeds the speed limit, come close to improperly trivializing the reasonable doubt standard."), *report and recommendation adopted*, No. 02-cv-02765, 2008 WL 496432 (E.D. Cal. Feb. 21, 2008).

the "everyday" confidence one possesses when deciding to drive, get up, or eat a meal. If anything, a reasonable juror could read the instruction and believe it was entirely compatible with the prosecutor's characterization of the reasonable doubt standard.[4] *See Segna*, 555 F.2d at 230–32 (holding that, although "some of the prosecutor's comments" correctly stated the law, the prosecutor's erroneous statements of law constituted plain error).

Next, the government argues that even if the prosecutor's statements trivialized the standard, the error was harmless because the court clarified for the jury that it was to follow the court's instruction "and not as to what any attorney says the standard of reasonable doubt is." Because the court provided the correct instruction and admonished the jury earlier during closing argument, the government argues, Velazquez suffered no prejudice.[5] We are not convinced

---

[4] The dissent argues that defense counsel's discussion of the reasonable doubt standard invited the prosecutor's comment during rebuttal argument. But the invited response doctrine is not implicated here because the prosecutor's initial improper statements preceded defense counsel's argument. *See United States v. Weatherspoon*, 410 F.3d 1142, 1150 (9th Cir. 2005). Perhaps for that reason, the government elected not to raise such an argument in its answering brief. Nonetheless, "even if any defense statements were somehow viewed as opening the door to a prosecutorial response," the prosecutor's comment "would still be inappropriate because 'the prosecution is not allowed to use improper tactics even in response to similar tactics by the defense.'" *Id.* (quoting *United States v. Sarkisian*, 197 F.3d 966, 990 (9th Cir. 1999)). "Prosecutors must understand the different—and special—place that they occupy in the criminal justice system," which, "as representative of the United States[,] . . . demands the exercise of far better restraint and better judgment than was exhibited here." *Id.*

[5] The dissent argues in part that the district court neutralized the prosecutor's improper statements by reminding the jury that the lawyers' arguments are not evidence. Our concern, however, is not with the

that the court sufficiently "neutralized" the prejudice.  *See Birges*, 723 F.2d at 672; *United States v. Weatherspoon*, 410 F.3d 1142, 1151 (9th Cir. 2005) (explaining prosecutor's improper statements were prejudicial because "the trial was doubly flawed: Objections were [] made by defense counsel, and whatever curative statements were provided by the district judge were inadequate").  Although the district court initially instructed the jury to follow its instruction on reasonable doubt and "not as to what any attorney says the standard of reasonable doubt is," the prosecutor then provided numerous improper examples that served to reduce the government's burden of proof—all without further admonishment.  And the district court overruled defense counsel's second objection after the prosecutor, during his rebuttal, rehashed an identical argument that reasonable doubt was something the jurors used "every single day."  *See Weatherspoon*, 410 F.3d at 1151.  By overruling the objection, the court naturally left the jurors with the impression that the prosecutor's comparison of the reasonable doubt standard to an "everyday" judgment, and that the specific examples the prosecutor furnished, were proper.  Moreover, the prosecutor's distortion of the standard was among the last things the jury heard before they began deliberations, further exacerbating our concerns.[6]  The risk that the jury believed that convicting a defendant was akin to, in the prosecutor's words, "getting up," "having a meal," or "travel[ing] to . . .

---

prosecutor's characterization of trial evidence, but with his trivialization of the reasonable doubt standard.

[6] For this reason, the government's citation to *United States v. Flores* is not persuasive, as the district court here did not read the correct statement of law "shortly after closing arguments."  *See* 802 F.3d 1028, 1039 (9th Cir. 2015).

court," was therefore high.[7] *See id.* at 1145–51 (holding that the prosecutor's improper vouching and other statements during closing argument constituted plain error).

Last, we do not believe that the evidence demonstrating Velazquez's knowledge of the drugs was so overwhelming that the prosecutor's misstatements were harmless. The government's case relied exclusively on circumstantial evidence, such as the value, type, and amount of drugs in the car; Velazquez's purported nervousness when he was stopped and the inconsistency about where he was headed; the lack of personalization in his car; and Velazquez's apparent attempt to distance himself from owning the car. None of these facts were uncontroverted or otherwise so damning that we are convinced the error was harmless.

To begin, the argument that the value, type, or amount of drugs found in Velazquez's car would not have been stored there without his knowledge is, at best, speculative and has no support in the record. The only evidence potentially

---

[7] The regular presumption that the jury accepts the law as stated by the court, not as stated by counsel, is not determinative here because the likely prejudicial effect of the prosecutor's trivialization of the reasonable doubt standard is high. *See United States v. Medina Casteneda*, 511 F.3d 1246, 1250 (9th Cir. 2008) (explaining on plain error review that the presumption was not overcome because the "jury never sought clarification of the standard, and the likely prejudicial effects of this misstatement of the law on the defendant in the context of the extensive closing arguments by both sides and proper jury instructions is very low"). The totality of the closing arguments likely left the jury with the impression that the prosecutor's improper explanations of the reasonable doubt standard were consistent with the court's instructions. This is particularly true where the court's final word on the issue was to overrule defense counsel's objection. Further, as explained below, the government's evidence was not so overwhelming as to render the error harmless.

supporting this view is Agent Day's testimony about the characteristics of blind mules generally, but he had no personal knowledge of whether those attributes applied to Velazquez's case in particular.

Further, as we have recognized, evidence about a defendant's nervousness provides limited objective value and does not even create reasonable suspicion to detain a person, let alone affirm a conviction. *See United States v. Chavez-Valenzuela*, 268 F.3d 719, 726 (9th Cir. 2001) ("Encounters with police officers are necessarily stressful for law-abiders and criminals alike."), *amended*, 279 F.3d 1062 (9th Cir. 2002), *overruled on other grounds by Muehler v. Mena*, 544 U.S. 93 (2005); *see also United States v. Wald*, 216 F.3d 1222, 1227 (10th Cir. 2000) (stating evidence of nervousness "is of limited significance" (citation omitted)).  In a similar vein, the fact that Velazquez initially told Officer Hanlon he was going to the DMV, and later told him that he was on his way to see his mother, is not an inconsistency that necessarily indicates a guilty conscience.

Additionally, Officer Hanlon's testimony about the car's lack of personalization was, as discussed above, undercut on cross-examination, as Velazquez's car did contain several items that did indicate personalization, such as a CD and "some other personal items" in the glove box, a can on the floor, a personal jacket or checkered top, a sun visor block in the back, and a "shirt or some such thing that[ was] kind of strewn" in the back.

Finally, although Velazquez's initial decision to lie about his cousin owning the car could, on the one hand, indicate consciousness of guilt, it was equally consistent with his testimony that he was afraid his car would again be impounded, just as his other car had been two weeks prior.

To be sure, we do not suggest the government had no case against Velazquez or that the evidence demonstrating his knowledge of the drugs was wholly lacking.  But our job is not to demonstrate Velazquez's innocence or eliminate any inkling of guilt.  Indeed, even if the government has presented a "strong circumstantial web of evidence against [Velazquez], it was also a case in which, absent the constitutionally forbidden comments, honest, fair-minded jurors might very well have brought in not-guilty verdicts." *Chapman v. California*, 386 U.S. 18, 25–26 (1967) (citation and internal quotation marks omitted); *see also Segna*, 555 F.2d at 230–32 ("Although the evidence was sufficient for us to sustain a finding of sanity by the jury, an objective review of the record, that is, one that does not view the evidence only in the light most favorable to the government as the prevailing party, reveals that the issue was extremely close.").

In sum, the ultimate issue at trial boiled down to whether the government proved that Velazquez knew about the drugs in his car beyond a reasonable doubt.  Reasonable doubt was the central theme of his defense.  The prosecutor's comments, however, created an unacceptable risk that an honest, fair-minded juror would succumb to the prosecutor's personal—rather than constitutional—view of the government's burden of proof to obtain a conviction and therefore overlook his or her reasonable doubts.  Because the evidence demonstrating Velazquez's knowledge was not overwhelming, and the district court failed to neutralize the prejudice, we conclude "that it is more probable than not that the misconduct materially affected the verdict."  *Tucker*, 641 F.3d at 1120 (citation omitted).

For the above reasons, we vacate Velazquez's conviction and remand for a new trial.[8]

**VACATED** and **REMANDED**.

---

BADE, Circuit Judge, dissenting:

Alfred Velazquez was arrested at a port of entry as he attempted to enter the United States from Mexico with nearly four-and-a-half pounds of a mixture or substance containing fentanyl and heroin, worth nearly $150,000, in two packages concealed in the intake manifold of his car's engine.  He was indicted on one count of importing controlled substances into the United States, in violation of 21 U.S.C. §§ 952 and 960.  Velazquez presented a "blind mule" defense at trial and testified that he did not know the drugs were hidden in his car.  After a two-day trial, the jury returned a guilty verdict in approximately three hours.

Velazquez argues that his conviction must be vacated because the prosecutor violated his due process rights by trivializing the reasonable doubt standard during closing argument.  The majority agrees and concludes that the prosecutor's comments in closing argument were improper and caused Velazquez substantial prejudice that the district court failed to neutralize.  I agree that the prosecutor's comments were, at best, "unhelpful," Maj. Op. 13 n.2 (quoting *Victor v. Nebraska*, 511 U.S. 1, 24 (1994) (Ginsburg, J., concurring)), and potentially misleading.  But "it 'is not enough that the prosecutors' remarks were

---

[8] In light of our disposition, we need not address Velazquez's remaining arguments.

undesirable or even universally condemned.'  The relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (citations omitted).  Here, the record overwhelmingly establishes that the prosecutor's comments did not affect the verdict and, thus, Velazquez's due process rights were not violated.

The majority vacates Velazquez's conviction, but in doing so it overlooks almost the entire trial record and erroneously fails to consider the prosecutor's comments in context.  *See United States v. Young*, 470 U.S. 1, 11 (1985) ("[A] criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial.");  *see also Boyde v. California*, 494 U.S. 370, 385 (1990) ("[T]he arguments of counsel, like the instructions of the court, must be judged in the context in which they are made." (citations omitted)).

Instead, the majority considers only isolated comments in the prosecutor's closing and rebuttal arguments, and it presents these comments in a confusing and inaccurate manner.[1]  The majority disregards defense counsel's failure

---

[1] The majority's failure to consider the prosecutor's comments in context results in a confusing and inaccurate presentation of what occurred at trial.  As described in detail below, there are three comments at issue.  Nonetheless, I identify these three comments at the outset to clarify the discussion.  First, in his closing argument, the prosecutor commented that "[r]easonable doubt is something that you make decisions about every single day"; defense counsel objected, and the court admonished the jury to follow the instructions on the standard of proof, not the attorneys' arguments.  The majority does not suggest that

to object to the comment that it appears to find most objectionable and repeatedly quotes in its opinion (specifically, the prosecutor's second comment in his closing argument in which he compared being "firmly convinced," the level of certitude needed to convict, to routine decisions involving getting up, having a meal, and driving). The majority also fails to consider the prosecutor's comments in context with the jury instructions, the court's repeated admonitions to the jury to ignore counsels' arguments interpreting the reasonable doubt standard and to rely only on the court's instructions, and defense counsel's closing argument.

When properly considered in context, the record readily establishes that the prosecutor's comments did not affect the verdict. *See United States v. Tucker*, 641 F.3d 1110, 1120 (9th Cir. 2011) (explaining that the defendant must "show

the court's admonition failed to mitigate any prejudice from this comment. Second, immediately after the court's admonition in response to the first comment, the prosecutor suggested that the jurors engage in daily activities—such as getting out of bed, eating, and driving—"firmly convinced" that they can perform each task safely. Defense counsel did not object to these comments. Third, in his rebuttal argument, the prosecutor commented that the reasonable doubt standard "is something that you use every single day in your life"; defense counsel objected, and the court overruled the objection. Significantly, the majority brushes aside Velazquez's failure to object to the second comment and any import that may have on the standard of review. *United States v. Tam*, 240 F.3d 797, 802 (9th Cir. 2001) ("We review claims of prosecutorial misconduct for plain error when the defendant did not object at trial, and for abuse of discretion when the district court denied an objection to closing argument." (citation omitted)); *see also United States v. Tucker*, 641 F.3d 1110, 1120 (9th Cir. 2011) (same). Even assuming Velazquez properly preserved review of each comment, his claim still fails because he cannot show that "it is more probable than not that the misconduct materially affected the verdict." *Tam*, 240 F.3d at 802 (internal quotation marks and citation omitted).

that it is more probable than not that the misconduct materially affected the verdict" (citation omitted)).  And the record shows that the district court appropriately neutralized any potential prejudice.  *Id.* at 1122; *see also United States v. Birges*, 723 F.2d 666, 672 (9th Cir. 1984) ("Improprieties in counsel's arguments to the jury do not constitute reversible error unless they are so gross as probably to prejudice the defendant, and the prejudice has not been neutralized by the trial judge." (internal quotation marks and citations omitted)).  Thus, the majority's conclusions cannot withstand a proper review of the record.  I respectfully dissent.

## I.

When reviewing a claim that improper argument violated a defendant's due process rights, the "remarks must be examined within the context of the trial to determine whether the prosecutor's behavior amounted to prejudicial error.  In other words, the [c]ourt must consider the probable effect the prosecutor's [comments] would have on the jury's ability to judge the evidence fairly." *Young*, 470 U.S. at 12. We have identified several relevant factors to consider "[i]n determining whether a comment rendered a trial constitutionally unfair." *Hein v. Sullivan*, 601 F.3d 897, 912–13 (9th Cir. 2010).  These factors include "whether the comment misstated the evidence, whether the judge admonished the jury to disregard the comment, whether the comment was invited by defense counsel in its summation, whether defense counsel had an adequate opportunity to rebut the comment, the prominence of the comment in the context of the entire trial and the weight of the evidence." *Id.* (citing *Darden*, 477 U.S. at 182).  Here, applying these factors and examining the prosecutor's comments in the

context of the trial readily establishes that Velazquez was not prejudiced by these comments.

## A.

As an initial matter, the majority acknowledges that the district court properly instructed the jury on the reasonable doubt standard, but it ignores the rest of the court's instructions. This is a crucial omission because we "assume[] that the jury listened to and followed the trial judge's instructions." *United States v. Wells*, 879 F.3d 900, 937 (9th Cir. 2018) (citations omitted). And "[t]he jury is regularly presumed to accept the law as stated by the court, not as stated by counsel." *United States v. Medina Casteneda*, 511 F.3d 1246, 1250 (9th Cir. 2008) (citation omitted). Therefore, we cannot conclude that the prosecutor's statements were prejudicial without considering the district court's instructions to the jury.

During the preliminary instructions, the district court repeatedly stated that the government must prove its case beyond a reasonable doubt and explained to the jury that "statements and arguments of the attorneys" are not evidence. Defense counsel then reiterated these points for the jury in his opening statement; he told the jurors repeatedly that the government must prove Velazquez's guilt beyond a reasonable doubt, and defined reasonable doubt by stating: "In other words, the prosecutor has to eliminate all reasonable or logical possibilities that Mr. Velazquez is innocent. That's the burden of proof."

Before counsel's closing arguments, the district court again instructed the jurors and told them: "You will have as many copies as you want of these instructions back in your jury room . . . . You'll each have a chance to take a look at them back in the jury room if you need to go back and

consult anything." The court repeatedly stated that the government had the burden of proof to establish Velazquez's guilt beyond a reasonable doubt, and accurately defined the reasonable doubt standard, stating in part:

> Proof beyond a reasonable doubt is proof that leaves you firmly convinced the defendant is guilty. It is not required that the government prove guilt beyond all possible doubt. A reasonable doubt is a doubt based on reason and common sense and is not based purely on speculation. It may arise from a careful and impartial consideration of all the evidence or from a lack of evidence.

The court again instructed the jury that "statements, objections, and arguments by the lawyers are not evidence," and reiterated that "what the lawyers have said in their opening statements, will say in their closing arguments, and at other times is to help you interpret the evidence, but it is not evidence."

After closing arguments, the court gave the jurors final instructions before excusing them to deliberate, and in those instructions, it again stated that the government must prove its case beyond a reasonable doubt, that the verdict must be based "only on the evidence received in this case and on these instructions," and again told the jurors that it would send the written instructions to the jury room. Thus, the record demonstrates that the district court appropriately instructed the jury, the district court admonished the jury not to consider the attorneys' arguments as evidence, and further explained that the verdict could only be based on the evidence and the instructions.

**B.**

The majority omits and mischaracterizes crucial details from the record that make it difficult, if not impossible, to properly gauge the prejudicial effect of the prosecutor's comments. Reviewing the prosecutor's comments, defense counsel's comments, the objections to those comments, and how the court responded in the context of the entirety of closing arguments makes it abundantly clear that it is not "more probable than not" that the prosecutor's comments "materially affected the verdict." *See Tucker*, 641 F.3d at 1120, 1122 (citation omitted).

During the prosecutor's closing argument, he stated once that the jurors applied the concept of reasonable doubt as part of "everyday" decision-making. The prosecutor stated that "[r]easonable doubt is something that you make decisions about every single day." Defense counsel objected, stating: "That misstates the standard of reasonable doubt. Improper argument." In response, the court admonished the jurors, stating: "[Y]ou will follow my instruction as to reasonable doubt and not as to what any attorney says the standard of reasonable doubt is. I instructed you on what the standard for reasonable doubt is, and you should follow that instruction."

The prosecutor then continued his explanation of reasonable doubt, suggesting that the jurors engage in daily activities—such as getting out of bed, eating, and driving— "firmly convinced" that they can perform each task safely. The majority quotes this portion of the prosecutor's argument in its opinion, and it appears that it is this portion the majority finds most prejudicial. But the majority fails to

place this comment in context and omits that defense counsel did *not* object to this comment.[2]

The prosecutor concluded his discussion of reasonable doubt by stating:  "The idea here is that it's all about reasonable doubt.  Not proof beyond all possible doubt." The prosecutor's comments on the reasonable doubt standard, in their entirety including the objection, the court's response, and the comparison to daily activities, comprised one minute at the beginning of his thirty-five-minute closing argument.  For the next thirty-two minutes, the prosecutor summarized and argued the evidence.

The majority concludes that the district court's admonition in response to the objection to the prosecutor's description of reasonable doubt did not "sufficiently 'neutralize[]' the prejudice," Maj. Op. 15–16 (quoting *Birges*, 723 F.2d at 672; *United States v. Weatherspoon*,

---

[2] Without distinguishing the comments to which defense counsel objected from comments to which he did not object, the majority suggests that there may be an intra-circuit conflict on the appropriate standard of review:  de novo or abuse of discretion.  But the majority concludes the result is the same under either standard and so it does not resolve this issue.  However, the case that the majority cites to suggest that such a conflict exists, *United States v. Wijegoonaratna*, states that "[w]e usually review for abuse of discretion a district court's overruling of an objection to prosecutorial misconduct."  922 F.3d 983, 989 (9th Cir. 2019) (citations omitted).  There, the court noted that the defendant suggested de novo review might apply and cited *United States v. Perlaza*, 439 F.3d 1149, 1169 n.22 (9th Cir. 2006), where the court reviewed de novo whether a closing argument constituted prosecutorial misconduct. *Wijegoonaratna*, 922 F.3d at 988–89.  But the court concluded that "*Perlaza* appears to have mistaken the standard of review" because it cited *United States v. Santiago*, 46 F.3d 885, 892 (9th Cir. 1995), "where we reviewed 'the court's overruling of the objection' to the prosecutor's comments at trial 'for abuse of discretion.'"  *Wijegoonaratna*, 922 F.3d at 989.

410 F.3d 1142, 1151 (9th Cir. 2005)), because the prosecutor "provided numerous improper examples" that reduced the government's burden of proof, "all without further admonishment." Maj. Op. 16. But this description of the court's response to the closing argument distorts what occurred. As set forth above, defense counsel *did not object* to the prosecutor's comment giving examples—getting out of bed, eating, and driving—which the prosecutor listed *immediately after* the court's admonition that the jury should follow its instructions and not follow "what any attorney says the standard of reasonable doubt is."

Apparently, the majority is suggesting that the district court should have sua sponte admonished the jury again—a few moments after its previous admonition—that it should not follow the attorneys' arguments on reasonable doubt. This is an absurd and legally unsupported standard to determine whether a district court's admonitions neutralized any prejudice from improper arguments. Instead, under *Hein*, the district court's admonition should be considered as a factor that mitigated any prejudice from the prosecutor's comment because "the judge admonished the jury to disregard the comment." 601 F.3d at 912.

Moreover, "prosecutorial misrepresentations . . . are not to be judged as having the same force as an instruction from the court." *Boyde*, 494 U.S. at 384–85. Therefore, "[o]rdinarily, a cautionary instruction is presumed to have cured prejudicial impact." *Dubria v. Smith*, 224 F.3d 995, 1002 (9th Cir. 2000) (en banc) (citation omitted); *see United States v. Davis*, 932 F.2d 752, 761 (9th Cir. 1991). In response to the only objection in this one-minute segment of the prosecutor's closing argument, the district court properly admonished the jury and reminded the jurors of the instructions on the reasonable doubt standard, which they

had heard multiple times and which they would take with them in written form into the jury room. Thus, the record establishes that the district court appropriately neutralized any prejudice from the prosecutor's comment and did not err by not sua sponte offering a second admonition a few seconds later.

Defense counsel also addressed the reasonable doubt standard in his closing argument. But unlike the prosecutor's argument, which addressed the reasonable doubt standard for one minute, defense counsel devoted about twenty minutes, of his forty-six minute closing argument, to his explanation of the reasonable doubt standard. Thus, defense counsel's lengthy argument on the reasonable doubt standard is another factor that mitigates any prejudice from the prosecutor's comment because "defense counsel had an adequate opportunity to rebut the comment." *Hein*, 601 F.3d at 912 (citation omitted).

In his closing argument, defense counsel stated that when the reasonable doubt instruction states that the government is not required to prove guilt "beyond all possible doubt," that means "they don't need to prove beyond any imaginary doubt or any fantasy." He also stated that if the jurors, "using reason or logic could believe that reasonable doubt might be true, that equals reasonable doubt." The prosecutor objected to both statements. The district court did not rule on the first objection, but instead again admonished the jurors that they should not follow the attorneys' interpretations of the reasonable doubt standard. The district court stated: "[A]s I cautioned you before, the lawyers will have argument as to how you should interpret this, but the law that I gave you is the law that you should follow and not what the attorneys argue it to be." The district court overruled the second objection, stating: "It's

argument.  The attorneys are simply arguing how you should interpret the law, but you should follow the law as I instruct you."

Two minutes later, defense counsel reiterated his interpretation of reasonable doubt, again telling the jurors that "when we're talking about beyond all reasonable doubt, we're not talking about fantasy.  We're not talking about fanciful doubt."  The prosecutor did not object, and the district court did not sua sponte admonish the jurors to follow its instructions on reasonable doubt, just as it did not sua sponte admonish the jurors after unobjected-to comments in the prosecutor's closing argument.

The defense attorney also described at length an incident from the 1980s in which someone tampered with Tylenol by putting cyanide in the pill bottles, which resulted in the deaths of several people.  He further stated that the manufacturer recalled the pills and created a tamper-evident seal "to eliminate any and all reasons that we would have to doubt the safety of their product."  Defense counsel then compared the government's case to the 1980s Tylenol bottle (without the tamper-evident seal) and told the jury:  "If you're going to hesitate to take one of those pills, you have reasonable doubt."  Thus, defense counsel likened the reasonable doubt standard to the absolute certainty of safety a person would need to have before ingesting a pill possibly containing a deadly poison.  But the prosecutor did not object, and again, the district court did not sua sponte admonish the jurors to follow the court's instructions, not the attorneys' arguments.

At the beginning of his fourteen-minute rebuttal argument, after defense counsel's argument, the prosecutor stated that reasonable doubt is "not proof beyond all possible doubt," and reiterated—without example or elaboration—

that each juror uses the reasonable doubt standard "every single day in your life." Defense counsel objected that the statement "diminishes the burden of proof. It's improper government argument." But this time the court simply responded, "Overruled." The prosecutor went on to argue the evidence for the next twelve minutes.

The prosecutor's comment in rebuttal appears to have been prompted by Velazquez's closing argument, which further reduces the likelihood that the comment had a prejudicial effect. "[T]he propriety of the prosecutor's remarks must be judged in relation to what would constitute a fair response to the remarks of defense counsel." *United States v. Lopez-Alvarez*, 970 F.2d 583, 597 (9th Cir. 1992) (citation omitted); *see Darden*, 477 U.S. at 182–83. Therefore, the prosecutor's comment in rebuttal must be viewed in context with defense counsel's poisoned pill illustration and suggestion that a juror's hesitation to convict equates to reasonable doubt.

Immediately after the court overruled defense counsel's objection, the prosecutor stated that "[i]t is not to be based purely on speculation. The pills, the bottle, all of that, has nothing to do with the [c]ourt's instruction to you regarding the standard for reasonable doubt." And both immediately before and after the comment that the jurors apply reasonable doubt "every single day," the prosecutor argued that defense counsel was trying to define reasonable doubt "where it becomes impossible for the United States to reach," and to "[r]aise it so high that the United States can't meet it." Thus, it appears that the prosecutor's comment was intended to refute defense counsel's suggestion that hesitation alone, or lack of absolute certainty, is sufficient to support a not guilty verdict. Therefore, the record demonstrates that the prosecutor's comment in rebuttal was

a fair response to defense counsel's argument, which mitigates any potential prejudice from the prosecutor's comment.[3] *Hein*, 601 F.3d at 912 (explaining that "whether the comment was invited by defense counsel in its summation" is a factor in determining whether a comment resulted in a denial of due process).

The majority nevertheless concludes that "[b]y overruling [defendant's] objection" to the prosecutor's comment in his rebuttal argument that jurors apply reasonable doubt every day, the district court conveyed to the jury that "the prosecutor's comparison of the reasonable doubt standard to an 'everyday' judgment, and . . . the specific examples the prosecutor furnished, were proper." Maj. Op. 16. Of course, the first problem with this conclusion is that the prosecutor *did not furnish any specific examples in his rebuttal argument* and so the district court was not overruling an objection to the prosecutor giving specific examples. Therefore, it is difficult to see how the court's response to this objection would leave "the jurors with the impression" that specific examples—that were stated without objection nearly an hour-and-forty minutes

---

[3] The majority appears to suggest that defense counsel's comments are not relevant to our analysis because the prosecutor made an improper comment before defense counsel's closing argument. But the majority does not limit its prejudice analysis to the prosecutor's initial comments; instead, the majority's analysis relies heavily on the prosecutor's comment in his rebuttal argument, which of course responded to defense counsel's closing argument. Moreover, in *Weatherspoon*, the case the majority cites to suggest we should not consider defense counsel's comments, we explained that we must "undertake a contextual review of prosecutorial misconduct" in light of "the entire trial." 410 F.3d at 1150–51 (citing *Young*, 470 U.S. at 12, 16).

earlier during the prosecutor's closing argument—were proper.

The majority further confuses the record by asserting that "the prosecutor's distortion of the standard was among the last things the jury heard before they began deliberations, further exacerbating our concerns.  The risk that the jury believed that convicting a defendant was akin to, in the prosecutor's words, 'getting up,' 'having a meal,' or 'travel[ing] to . . . court,' was therefore high."  Maj. Op. 16–17 (alteration in original) (footnote omitted).  But the prosecutor's comment in which he gave the everyday examples that the majority references was not "among the last things the jury heard before they began deliberations."  Maj. Op. 16.  Rather, the prosecutor offered these examples at the beginning of his closing argument, before defense counsel's closing argument, before his rebuttal argument, and before the court's final instructions—*two hours* before the court excused the jury to deliberate.

And the prosecutor's comment in rebuttal, suggesting that the standard for "firmly convinced" is something the jurors use every day, was also not "among the last things the jury heard before they began deliberations."  Maj. Op. 16.  Instead, the jurors heard an additional twelve minutes of rebuttal argument and six minutes of final instructions, and therefore the jurors heard this comment nearly twenty minutes before they were excused to begin deliberations.

Moreover, in the final instructions, which were the last thing the jurors heard before deliberations, the court again reminded the jurors that they "must base [their] verdict only on the evidence received in this case and on these

instructions."[4]  Thus, the majority's inaccurate recitation of the record is a fundamental flaw in its analysis, as these inaccuracies obfuscate what effect—if any—the prosecutor's statements had on the jury.

## C.

Beyond these misstatements of the record, the majority also ignores the district court's treatment of objections throughout both attorneys' closing arguments and the different weight given to the court's instructions and the attorneys' arguments.  *See Boyde*, 494 U.S. at 384 ("[A]rguments of counsel generally carry less weight with a jury than do instructions from the court.  The former are usually billed in advance to the jury as matters of argument, not evidence, and are likely viewed as the statements of advocates; the latter, we have often recognized, are viewed as definitive and binding statements of the law." (citations omitted)).

---

[4] The majority suggests that my reference to the district court's instruction that the lawyers' arguments are not evidence is misguided because the "concern" here "is not with the prosecutor's characterization of trial evidence, but with his trivialization of the reasonable doubt standard."  Maj. Op. 15 n.5.  Although that instruction is relevant to the prejudice analysis, it is not the only (or even the primary) reason I conclude that the district court properly neutralized any prejudice.  *See United States v. Koon*, 34 F.3d 1416, 1445 (9th Cir. 1994) (stating that instructing jury "to rely only on the evidence introduced at trial" and that "argument is not evidence . . . dilute[s] the potential prejudice arising from improper statements" (citations omitted)), *rev'd in part on other grounds*, 518 U.S. 81 (1996).  Instead, as described throughout this dissent, I conclude that the district court neutralized any prejudice arising from the prosecutor's comments by properly instructing the jury on the reasonable doubt standard and by repeatedly admonishing the jury that it must apply the court's instructions on the reasonable doubt standard, not counsel's arguments.

A complete review of the district court's responses to the objections conclusively establishes that the jurors would not have concluded that, because the court overruled an objection, the prosecutor's comment in his rebuttal argument was proper.  Instead, the record establishes that the district court responded to objections by repeatedly admonishing the jurors that the attorneys were making arguments, but the jurors should follow the court's instructions and their recollection of the evidence.[5]

During the prosecutor's closing argument, after objecting to the prosecutor's comment on the reasonable doubt standard, defense counsel made two additional objections.  In each objection, defense counsel asserted that the prosecutor's arguments assumed facts that were not in evidence.  The district court sustained the first objection, but did not rule on the second objection and instead reminded the jurors that they were "the judge of what the testimony was and the attorneys' statements are not evidence."

The prosecutor also made objections to defense counsel's closing argument, beyond his two objections to defense counsel's statements defining reasonable doubt.  The prosecutor objected twice that defense counsel's argument misstated testimony.  The court overruled both objections and admonished the jurors, stating: "I will remind you again that the evidence is as you remember it to be, not

---

[5] Defense counsel objected three times in the prosecutor's closing argument, the prosecutor objected six times in defense counsel's closing argument, and defense counsel objected twice in the prosecutor's rebuttal argument.  In response, the district court sustained only one objection, admonished the jurors to follow the instructions and their recollection of the evidence but did not otherwise rule on three objections, overruled three objections and admonished the jury to follow the instructions, and finally, overruled four objections without comment.

as the lawyers represent it to be," and "you'll rely on the evidence as you remember it."

The prosecutor also objected, without stating a basis, to defense counsel's argument that the government presented testimony about the dangerousness of fentanyl "to persuade [the jury], to prejudice [the jury], to convict Mr. Velazquez from an emotional point of view." The district court overruled the objection without comment. The prosecutor also objected that defense counsel misstated the law by arguing that the prosecutor had the power to file an indictment and was the most powerful person in the room. Again, the district court overruled the objection without comment. Given the court's many admonishments about the nature of the attorneys' arguments, it would be absurd to suggest that, by overruling these objections, the district court was conveying to the jurors that the government was trying to convince them to return a guilty verdict based on their emotions, rather than the evidence, or that the court agreed that the prosecutor was the most powerful person in the room.

During the prosecutor's rebuttal argument, in addition to objecting to the prosecutor's comment on reasonable doubt, defense counsel objected that the prosecutor's argument assumed facts not in evidence. The court overruled the objection without comment. Again, given the court's repeated admonitions in response to earlier objections, it would be unreasonable to conclude that, by overruling the objection, the court was suggesting that the jury should accept the prosecutor's characterization of the facts.

The record conclusively establishes that the district court appropriately instructed the jury and reinforced those instructions with repeated admonitions that the jurors should follow the court's instructions and their recollection of the

evidence, not the attorneys' arguments.  When the objections and the court's responses are considered in context, the record unambiguously refutes the majority's conclusion that the district court failed to neutralize any prejudice from the prosecutor's comment in rebuttal by overruling an objection.

**D.**

Given that both sides made arguably hyperbolic and inaccurate statements about the standard of proof and that the court repeatedly admonished the jury to follow only its instruction, not the attorneys' arguments, it is highly unlikely that the prosecutor's and defense counsel's comments on the reasonable doubt standard influenced the jurors' review of the evidence.  *See Lopez-Alvarez*, 970 F.2d at 598 (concluding that "any prejudice which might have resulted from the [prosecutor's] comments was 'neutralized by the trial judge' when he instructed the jury that '[t]he lawyers' statements are not evidence'" (second alteration in original) (citation omitted)).

Critically, the majority fails to consider the prosecutor's comments in the context of the entire trial, including the district court's repeated admonitions to the jury to follow its instructions on the reasonable doubt standard.  The majority does not explain how Velazquez overcame the presumption that the jury followed these admonitions.  *See Medina Casteneda*, 511 F.3d at 1250.  Instead, it cites *Weatherspoon* to support its assertion that "whatever curative statements were provided by the district judge were inadequate."  Maj. Op. 16 (quoting 410 F.3d at 1151).  But *Weatherspoon* provides scant support for the majority's argument.

In that case, the prosecutor repeatedly vouched for government witnesses and encouraged the jury to convict the defendant to protect the community.  *See Weatherspoon*,

410 F.3d at 1146. However, the description of the proceedings does not state that the district court ever admonished the jury to ignore the prosecutor's comments. *See id.* at 1151; *see also id.* at 1155–70 (Trott, J., concurring in part and dissenting in part) (describing relevant portions of each side's closing arguments and the court's rulings on objections). By contrast, here, the court explicitly and repeatedly admonished the jury to follow its instructions on the reasonable doubt standard, not counsels' arguments.

We must presume that the jury followed the court's instructions and admonitions as there is no evidence that it did not. *See United States v. Flores*, 802 F.3d 1028, 1040 (9th Cir. 2015) (stating that the court presumes the jury followed the instructions when determining whether the defendant was guilty); *Medina Casteneda*, 511 F.3d at 1250 ("The jury is regularly presumed to accept the law as stated by the court, not as stated by counsel." (citation omitted)). As we explained in *Medina Casteneda*, the presumption that the jury followed the court's instructions is not overcome when "there is no evidence that the jury was confused by the proof beyond a reasonable doubt standard" and it "never sought clarification of the standard" and, therefore, "the likely prejudicial effects of [a] misstatement of the law on the defendant in the context of the extensive closing arguments by both sides and proper jury instructions is very low." *Id.* Because Velazquez has not rebutted this presumption, he has not shown that it is "more probable than not that the misconduct materially affected the verdict." *Tucker*, 641 F.3d at 1120 (quoting *Tam*, 240 F.3d at 802).

## II.

To determine whether the prosecutor's comments "infected the trial with unfairness," we may also consider "the prominence of the comment in the context of the entire

trial and the weight of the evidence." *Hein*, 601 F.3d at 912–13 (citation omitted). Here, the prosecutor's comments comprised about ninety seconds of the hour-and-forty minutes of closing arguments from both attorneys. These arguments followed a two-day trial, during which five witnesses testified, including Velazquez, and forty-two exhibits were admitted into evidence. Thus, the prosecutor's comments were not prominent in the context of the entire trial and were not likely to have affected the jury's ability to weigh the evidence fairly.

Moreover, the evidence against Velazquez was overwhelming. There is no dispute that Velazquez was attempting to enter the United States with a large amount of fentanyl and heroin concealed in the engine of his car. He did not challenge these facts. Instead, Velazquez presented a "blind mule" defense at trial and testified that he did not know the drugs were hidden in his car. Specifically, Velazquez testified about his girlfriend Bella, who lived in Tijuana, her uncle Juan, her neighbor Rayo, and her ex-boyfriend Emmanuel, and that he had heard rumors that they were involved in drugs. He also testified that Bella, Juan, Rayo, and Emmanuel knew where he parked his car in Tijuana, and Bella knew where he parked his car in the United States.

But Velazquez's testimony was uncorroborated. He did not provide the last names, addresses, or telephone numbers of Bella, Juan, Rayo, or Emmanuel, and as the prosecutor argued to the jury, "[t]he only evidence that these people exist came from the defendant." The prosecutor further argued that the defendant was not credible, in part, because he did not present any evidence to support his blind mule defense until he testified. The prosecutor stated: "The defendant on the day of arrest said nothing to [the agents].

He admits that. All these people involved in narcotics trafficking surrounding the defendant. He says nothing."

In a similar case in which the defendant was apprehended crossing the border with drugs in her car and claimed that they were planted without her knowledge, we described the evidence of the defendant's guilt as "overwhelming," *Flores*, 802 F.3d at 1038, and characterized the uncorroborated blind mule defense as "highly suspect," *id.* at 1039. Indeed, while the defendant in *Flores* presented a theory at trial on how she believed the drugs were planted, we emphasized that the defendant failed to mention any of the details behind her theory to agents and that she failed to "take[] even basic steps to . . . corroborate her story," just as Velazquez failed to do here. *Id.* at 1038–39. As in *Flores*, in this case "the government was free to ask the jury to disbelieve" the defendant. *See id.* at 1035.

The majority, however, does "not believe that the evidence demonstrating Velazquez's knowledge of the drugs was so overwhelming that the prosecutor's misstatements were harmless." Maj. Op. 17. The majority then asserts that "[t]he government's case relied exclusively on circumstantial evidence," including the value, type, and amount of drugs in Velazquez's car, his nervousness, his inconsistent statements about his destination, the lack of personalization in his car, and his false statements to agents about the ownership of the car. Maj. Op. 17. But the majority's characterization of the strength of the evidence overlooks the most critical evidence at the trial: Velazquez's testimony.

As the majority states, "the ultimate issue at trial boiled down to whether the government proved that Velazquez knew about the drugs in his car beyond a reasonable doubt." Maj. Op. 19. And Velazquez made his credibility the central

issue in the trial. The district court instructed the jury on the factors it could consider when deciding which witness testimony to believe or not believe, and Velazquez has not argued that there were any errors in those instructions. The court instructed the jury that it could consider, among other factors, "the witness' interest in the outcome of the case," "the witness' bias or prejudice, if any," and "the reasonableness of the witness' testimony in light of all the evidence." *See Flores*, 802 F.3d at 1038–39.

At the end of his direct examination, defense counsel elicited the following testimony from Velazquez:

> Q. Okay. Alfred, did anybody pay you to move a load of drugs across the border that day?
>
> A. No, sir.
>
> Q. Okay. Did you have any idea that somebody had put drugs in that car?
>
> A. No, sir.
>
> Q. If you had known that there [were] drugs in that car, would you have crossed it?
>
> A. I wouldn't do that.
>
> Q. And are you telling us the absolute truth today?
>
> A. Yes, sir.

If the jury had accepted this testimony, it would have found him not guilty and rejected the government's arguments to the contrary. Velazquez declared unequivocally that he did

not know that drugs were in his car and that he was telling the "absolute truth." If the jury had accepted this testimony, regardless of any circumstantial evidence the government presented about whether the defendant appeared nervous, or his statements about his destination or the car ownership, it would have acquitted him.

But from the guilty verdict, we must conclude that the jury did not find Velazquez credible, and it rejected his testimony. There is nothing in the record that suggests that the jury did not understand its task in evaluating the credibility of testimony or the court's instructions. Thus, it is very unlikely that the attorneys' conflicting arguments on the reasonable doubt standard, including the prosecutor's comments, had any effect on whether the jury believed Velazquez. Therefore, the record supports only one conclusion—it is not likely that the prosecutor's comments affected the verdict.

## III.

The majority opinion erroneously concludes that the prosecutor's isolated comments on the reasonable doubt standard during his closing and rebuttal arguments prejudiced Velazquez. But the majority fails to consider these statements in context, including the district court's instructions, its repeated admonitions that the jury must follow the instructions—not the attorneys' arguments, defense counsel's arguments on reasonable doubt, and the overwhelming evidence of defendant's guilt. Instead, the majority's conclusions are based on an inaccurate and incomplete statement of the record.

Nothing in the record suggests that the jurors ignored the district court's repeated admonitions to follow its instructions on reasonable doubt, and in the absence of

evidence to the contrary, we must presume that they followed the court's instructions.  And nothing in the record suggests that the prosecutor's statements affected the verdict.  Therefore, I cannot conclude that the trial was so unfair that Velazquez's due process rights were violated.  I respectfully dissent.